No. 51,395

STATE OF KANSAS, *Appellee,* v. JOE MCDANIEL and BOYD S. OWENS, JR., *Appellants.*

(612 P.2d 1231)

Opinion filed June 14, 1980.

*Michael Redmon,* of Kansas City, argued the cause and was on the brief for the appellant McDaniel.

*Jay H. Vader,* of Jenkins, Way, Turner & Vader, Chartered, of Kansas City, argued the cause, and *Robert E. Jenkins,* of the same firm, was with him on the brief for the appellant Owens.

*Nick A. Tomasic,* district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Dennis L. Harris,* assistant district attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict which found Joe McDaniel and Boyd S. Owens, Jr., (defendants-appellants) guilty of one count each of aggravated robbery (K.S.A. 21-3427). Alleged trial errors are asserted on appeal.

About 3:15 p.m. on January 20, 1979, Leonard Martin, Jr., assistant manager of the Collins Oil Station, 164 South 18th Street, Kansas City, Wyandotte County, Kansas, was the victim of a robbery at gunpoint. Martin testified that he observed a car containing two adult white males drive up to the full service island in front of the station building. Martin was told by the driver, McDaniel, to fill the tank. McDaniel exited the car, went inside the station, then called out and told Martin to check the oil. Martin asked the passenger, Owens, to turn off the car's engine. Owens first refused, but when Martin relayed McDaniel's order to check the oil Owens complied and shut off the car engine. Martin filled the gas tank, added two quarts of oil, and then began washing the car windows. McDaniel asked Martin if he could break a $50 bill; Martin responded in the negative. When Martin was washing the passenger side window, he was asked about breaking a $20 bill. Martin replied that he would have to go inside the station to do it. The transcript does not clearly indicate which appellant asked Martin about the $20 bill.

When he finished washing the windows Martin returned to the driver's window and asked for $13.20. McDaniel reached inside his coat pocket as if to retrieve money, but brandished a gun instead. Martin described the gun as a .32- or .38-caliber pistol. When McDaniel displayed the gun he demanded, "Give me it. . . . You know, give it here." Martin told McDaniel he had only the money changer because the shift had just begun. Martin surrendered the money changer and turned his pockets inside out to show he had no more money. McDaniel then drove the car away from the station.

Martin observed the car's license tag number and wrote it down. Martin's wife had arrived shortly before the robbery; she also observed and remembered the license tag number. The police were given the license tag number and a description of the car. At about 4:15 p.m., one hour after the robbery, policemen located a Chevy Nova fitting the description of the suspect vehicle. The car was parked at a private club and bore a license tag with the number reported by the Martins. The police entered the club and observed two men fitting the suspects' descriptions. The suspects, the appellants, were arrested and searched. A .32-caliber pistol was recovered from Owens' coat pocket. Later that day, Martin and his wife identified the car at the club, and selected both appellants from lineups.

Police investigation revealed that the automobile the appellants used was owned by Owens' girl friend, Deana Green. The appellants borrowed Ms. Green's car about 2:00 p.m. the day of the robbery. Ms. Green had not yet purchased a license tag for the car. The license tag affixed to the car the day of the robbery was registered to Mrs. Mary Rogers. About 7:00 a.m. on January 20, 1979, Mrs. Rogers and her husband discovered the license tag had been stolen from her vehicle during the preceding night. Mrs. Rogers reported the theft of the license tag to police the same day, the day of the robbery.

Both appellants testified on their own behalf at trial. They admitted the crime occurred, but asserted the defense of voluntary intoxication. Ms. Green testified that she, the appellants, and McDaniel's girl friend, consumed two fifths of schnapps, one quart of premixed vodka screwdrivers, and one case of beer the day of the robbery.

McDaniel asserts four issues on appeal. He contends that (1)

the trial court erred in admitting Mrs. Rogers' testimony; (2) the prosecutor committed prejudicial error by remarks made in closing argument; (3) an instruction on presumed intent was erroneous; and (4) the sentence was cruel and unusual. The appellant Owens asserts two issues on appeal. He contends the trial court erred in (1) admitting Mrs. Rogers' testimony; and (2) in its instruction on the voluntary intoxication defense.

Both appellants assert one common issue on appeal, that the trial court erred in admitting Mrs. Mary Rogers' testimony. Mrs. Rogers was called as a State's witness. Shortly after Mrs. Rogers took the stand the following exchange occurred between court and counsel:

"MR. JESERICH: Anticipating what this evidence is going to be, I'm assuming what Dennis is going to show here is that somebody took these tags from this car. I'm going to object to any further testimony because I believe it's irrelevant and unnecessary and could be prejudicial to my client simply because the jury might draw an inference that they—that Joe McDaniel along with Steve Owens stole this tag. Mr. Harris already got in evidence this was the tag on the car when it was found and that the tag was on the car at the time of the robbery. I think that's all. That is sufficient as to the relevance of the robbery charge. Anything additional is going into—

"THE COURT: I don't know what she saw. She see these guys take it?

"MR. HARRIS: No.

"THE COURT: She just say—

"MR. HARRIS: The tag was on her car when she went to bed. On the 20th when she got up in the morning, it was gone.

"MR. JESERICH: If she doesn't have any knowledge, I think it's irrelevant and that's why I'm objecting. I think the jury might draw an unfair reference from it.

"THE COURT: Objection overruled.

"MR. JENKINS: I have the same objection for the record."

Mrs. Rogers then testified that she and her husband discovered the theft of the license tag the same day of the robbery and reported the theft to the police.

The appellants contend the trial court erred in admitting Mrs. Rogers' testimony over their objections. They argued that the admission of the evidence violated the pretrial order and constituted unfair surprise. The pretrial order recited that the State did not intend to use evidence of prior crimes. The appellants also contend the court erred in failing to conduct a hearing before admitting Mrs. Rogers' testimony. The trial court held no hearing to weigh the probative value of the evidence against its prejudicial effect. Finally, the appellants contend neither the State nor the trial court specified the material fact concerning which the

evidence was probative, as required by K.S.A. 60-455, and no limiting instruction was given.

The State contends the evidence was admissible independent of K.S.A. 60-455 as part of the *res gestae.*

On its face, Mrs. Rogers' testimony is evidence of a crime committed by some person(s). In conjunction with other testimony the clear inference is that the appellants stole the license tag. That evidence could have created an inference that the appellants were disposed to commit the robbery. K.S.A. 60-455 prohibits admission of such evidence unless it is relevant to prove one of eight specific factors. But, in certain instances, Kansas case law permits admission of such evidence independent of 60-455. Acts done or declarations made before, during or after the happening of the principal occurrence may be admissible as part of the *res gestae* where the acts are so closely connected with it as to form in reality a part of the occurrence. *State v. Gilder,* 223 Kan. 220, 228, 574 P.2d 196 (1977); *State v. Ferris,* 222 Kan. 515, 517, 565 P.2d 275 (1977).

In *State v. Ferris,* 222 Kan. at 517, this court held that testimony describing a purse snatching by the defendant prior to the aggravated battery against a law enforcement officer was admissible as part of the *res gestae.* In *State v. Hale,* 206 Kan. 521, 525, 479 P.2d 902 (1971), we held that evidence of the defendant's attempt to conceal his crime was admissible as part of the *res gestae,* stating:

"Likewise, the evidence relating to the defendant's plans and preparations to destroy his place of refuge by setting it on fire may properly be considered as part and parcel of his general scheme and as falling within the *res gestae.* The fashioning of an incendiary device, as testified to by his erstwhile friend, Judy, plus his actions in strewing clothing and heating elements about the house may logically be said to negative an innocent occupancy of the building. Such elaborate preparations for the destruction of the house would seem more consistent with an intention to cover up or conceal all traces of the burglary and resulting theft."

The opinion of the court in *State v. Platz,* 214 Kan. 74, 76-77, 519 P.2d 1097 (1974), bears directly upon this point, where the court said:

"Since the firearm was used to assist in carrying out the crime and to keep another person from coming to the scene of the crime this testimony was part of the *res gestae.* Acts done or declarations made before, during or after the happening of the principal fact may be admissible as part of the *res gestae* where such are

so closely connected with it as to form in reality a part of the occurrence. [Citations omitted.] The fact that evidence bearing upon the crime charged may indicate the commission of another crime does not render such evidence inadmissible if it is relevant to establish the guilt or innocence of the defendant with respect to the crime charged. (*State v. Martin,* 175 Kan. 373, 385, 265 P.2d 297.)"

The theft of the license tag was so closely related in time to the aggravated robbery that we find it was part of the occurrence and admissible as part of the *res gestae.* The tag was stolen the night immediately before the robbery and was next seen on the getaway vehicle. Since the vehicle had no license tag before the appellants borrowed it, the stolen tag was so closely connected with the vehicle as to form in reality a part of the occurrence. The stolen tag served to conceal who committed the crime and was used to avoid apprehension. A car without a tag was likely to draw police attention. As it turned out, the license tag was the primary means of identifying the getaway vehicle and locating the appellants after the robbery. Evidence of the license tag's origin was relevant to further explain all of the circumstances surrounding the principal crime.

Since Mrs. Rogers' testimony was properly admissible wholly aside from K.S.A. 60-455, other arguments on this point by the appellants lack merit.

Owens asserts only one additional error. He contends the trial court erred in giving Instruction No. 6, which reads:

"Voluntary intoxication is not a defense to the crime charged, aggravated robbery. The state must show each element of the crime charged as set out in Instruction Number 5 and that the conduct of the defendant was wilful or wanton without regard to their state of sobriety."

Instruction No. 6 was proper as to McDaniel. Voluntary intoxication is not a defense to a general intent crime, although it may be used to demonstrate an inability to form a particular state of mind necessary for a specific intent crime. *State v. Rueckert,* 221 Kan. 727, 732-33, 561 P.2d 850 (1977); See *State v. Smith,* 225 Kan. 796, 799, 594 P.2d 218 (1979); *State v. Cunningham,* 222 Kan. 704, 707, 567 P.2d 879 (1977); *State v. Farris,* 218 Kan. 136, 542 P.2d 725 (1975). McDaniel was convicted as a principal for the crime of aggravated robbery. Aggravated robbery is not a specific intent crime, it requires only general criminal intent. See *State v. Cunningham,* 222 Kan. at 707; *State v. Rueckert,* 221 Kan. at 733; *State v. Thompson,* 221 Kan. 165, 174, 558 P.2d 1079 (1976).

Owens contends the trial court should have given PIK Crim. 54.12, which states:

"Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind."

Owens was charged as a principal for aggravated robbery, but all the evidence tended to indicate Owens was merely an aider and abettor. Owens had consumed large amounts of alcohol the day·of the robbery. While the appellants were at the station Owens remained in the passenger seat of the car. Owens' only action was to shut off the car engine when so instructed by Martin. The record is unclear whether Owens spoke any words while at the station. When the appellants were apprehended Owens was searched and the gun was found in his pocket. When ruling upon the motion for new trial, the court expressed its belief that Owens "was found guilty as an accessory, aiding and abetting."

Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor; however, when a person knowingly associates with the unlawful venture and participates in a way which indicates he willfully is furthering the success of the venture, such evidence of guilt is sufficient to go to the jury. *State v. Wilson & Wentworth,* 221 Kan. 359, 367, 559 P.2d 374 (1977); see *State v. Schriner,* 215 Kan. 86, 523 P.2d 703 (1974). A person is criminally responsible for a crime committed by others if that person *intentionally* aids and abets the others in the commission of the crime. *State v. Goering,* 225 Kan. 755, 758, 594 P.2d 194 (1979); see *State v. Edwards,* 209 Kan. 681, 498 P.2d 48 (1972). K.S.A. 21-3205(1) states that "[a] person is criminally responsible for a crime committed by another if he intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime."

The trial court gave Instruction No. 8, on aiding and abetting. It reads:

"A person is criminally responsible for the conduct of another when either before or during the commission of a crime, and with the intent to promote or assist in the commission of a crime, he intentionally aids or advises the other to commit the crime. To be guilty of aiding and abetting in the commission of a crime, the defendant must wilfully and knowingly associate himself with the

unlawful venture and wilfully participate in it as he would in something he wishes to bring about or to make succeed."

When, as here, the evidence indicates Owens could only be found guilty of aggravated robbery as an aider and abettor, his specific intent is an issue, and voluntary intoxication may indicate an absence of the required intent and be a defense. Accordingly, the trial court erred by not instructing the jury in accordance with PIK Crim. 54.12. For the reasons stated the conviction of Owens must be reversed.

McDaniel contends it was prejudicial error for the prosecutor to express his personal belief of the appellants' guilt. During closing argument the prosecutor told the jury, "I personally don't think there is any question as to the guilt and responsibility' of these individuals for their action here in Wyandotte County." Neither counsel objected to the prosecutor's comment. It is improper for a prosecutor to inject into closing argument his personal belief as to the guilt of the defendant. *State v. Murrell,* 224 Kan. 689, 696, 585 P.2d 1017 (1978); see *State v. McClain,* 216 Kan. 602, 607-08, 533 P.2d 1277 (1975). However, the rule is well settled that reversible error cannot be predicated upon a complaint of misconduct of counsel in closing argument where no objection is lodged. *State v. Dorsey,* 224 Kan. 152, Syl. ¶ 3, 578 P.2d 261 (1978); *State v. Watkins,* 219 Kan. 81, Syl. ¶ 5, 547 P.2d 810 (1976); *State v. McClain,* 216 Kan. at 608.

McDaniel contends the trial court erred in giving Instruction No. 9 on intent, which reads as follows:

"There is a presumption that a person intends all the natural and probable consequences of his voluntary acts, and this presumption of law will prevail unless, after a consideration of all the evidence, facts and circumstances bearing upon the point, you have a reasonable doubt of the existence of such intent."

We considered a similar instruction in *State v. Egbert,* 227 Kan. 266, 267, 606 P.2d 1022 (1980), where we stated:

"Defendant next contends that the trial court erred in giving instruction 5 which followed PIK Crim. 54.01, as follows:

" 'There is a presumption that a person intends all the natural and probable consequences of his voluntary acts. This presumption is overcome if you are persuaded by the evidence that the contrary is true.'

Defendant contends that this instruction could have been interpreted by the jury as either a conclusive presumption on the issue of intent, or as a burden-shifting presumption, in violation of the rationale of *Sandstrom v. Montana,* 442 U.S. 510, 61 L.Ed.2d 39, 99 S.Ct. 2450 (1979). Trial was held on May 9, 1978; *Sandstrom*

was not decided until June 18, 1979. PIK Crim. 54.01 was discussed at length by our Court of Appeals in the light of *Sandstrom* in the recent case of *State v. Acheson,* 3 Kan. App. 2d 705, 601 P.2d 375 (1979), and we need not repeat what was there said. We hold that the two-sentence instruction given creates 'a permissive presumption and does not shift the burden of proof to the defendant,' as concluded by the Court of Appeals."

Here, PIK Crim. 54.01 was not the instruction given by the trial court, but Instruction No. 9 is for all practical purposes identical in its meaning and does not create a "conclusive presumption" or shift the burden of proof. The Court of Appeals analysis in *State v. Acheson,* 3 Kan. App. 2d 705, 715-17, 601 P.2d 375 (1979), is lengthy, but nevertheless correctly outlines the factors to be considered. Instruction No. 7 given to the jury was identical to the curative instruction given in *State v. Lassley,* 218 Kan. 758, 545 P.2d 383 (1976), and *State v. Acheson,* 3 Kan. App. 2d at 714. Despite our decision upholding the instruction, the proper instruction to be used is the revised PIK Crim. 54.01 (1979 Supp.).

McDaniel attacks the constitutionality of K.S.A. 1979 Supp. 21-4618, which requires denial of probation. He contends the statute is constitutionally impermissible on three grounds: (1) It denies him equal protection of the laws; (2) it deprives him of liberty without due process of law; (3) it constitutes cruel and unusual punishment. We disposed of the same three arguments in *State v. Freeman,* 223 Kan. 362, Syl. ¶ ¶ 4, 5, 6, 574 P.2d 950 (1978), where we resolved the equal protection and due process arguments against the defendant, and held:

"A state statute may single out a class of persons for distinctive treatment only if the classification bears a rational relation to the purpose of the legislation and if persons similarly situated with respect to the legitimate purpose of the law receive like treatment."

"K.S.A. 1977 Supp. 21-4618 and 22-3717(8), which deny the privileges of probation and parole and require mandatory minimum sentences for all Article 34 crimes in which the defendant used a firearm in the commission of the crime, are not constitutionally impermissible as denying equal protection of the law."

"In light of the Kansas sentencing statute, K.S.A. 21-4501(*b*), the provisions of K.S.A. 1977 Supp. 21-4618 and 22-3717(8) denying probation and parole privileges to a defendant convicted of an Article 34 crime in which the defendant used a firearm in the commission of the crime of murder in the second degree are not such a restriction on the judicial power of the sentencing judge as would constitute an impermissible legislative usurpation of the court's prerogatives."

See *City of Junction City v. Griffin,* 227 Kan. 332, 338-39, 607 P.2d 459 (1980).

The appellant's third constitutional challenge is not amenable to brief disposition. McDaniel contends the sentence was disproportionate to the crime and shocks the conscience. He emphasizes the fact that he was intoxicated, that no one was injured, and the proceeds of the robbery were minimal.

The recent United States Supreme Court decision, *Rummel v. Estelle,* 445 U.S. 263, 63 L.Ed.2d 382, 100 S.Ct. 1133 (1980), is the latest word of the United States Supreme Court where a criminal defendant's sentence is challenged as cruel and unusual punishment in violation of the 8th and 14th Amendments to the United States Constitution. Writing for a five-justice majority, Justice Rehnquist rejects a criminal defendant's contention that a sentence of life imprisonment was disproportionate to the underlying felony. Rummel had been convicted of three non-violent property-related offenses which involved a total of $230. In 1964 Rummel pleaded guilty to fraudulent use of a credit card ($80) and was sentenced to three years in the state penitentiary. In 1969 Rummel pleaded guilty to passing a forged check ($28.36) and was sentenced to four years' confinement. In 1973 Rummel was convicted of obtaining $120.75 by false pretenses. Rummel was sentenced to this last offense to life imprisonment under the Texas recidivist statute. Justice Rehnquist recognizes that prior United States Supreme Court opinions used a disproportionality analysis when addressing cruel and unusual punishment charges. However, those cases are now deemed distinguishable because they dealt with a death penalty or punishment of an extraordinary nature. Justice Rehnquist writes:

"Given the unique nature of the punishments considered in Weems [217 U.S. 349, 54 L.Ed. 793, 30 S.Ct. 544 (1910)] and in the death-penalty cases, one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative." 445 U.S. at 274.

The *Rummel* decision is important here because the Kansas Supreme Court has heretofore adopted a disproportionality analysis in response to United States Supreme Court decisions.

Section 9 of the Kansas Bill of Rights prohibits the infliction of cruel or unusual punishment. As early as 1890 this court in *State v. White,* 44 Kan. 514, 520-21, 25 Pac. 33 (1890), suggested that section 9 of the Kansas Bill of Rights "relates to the kind of punishment to be inflicted, and not to its duration." See *Cipolla v. State,* 207 Kan. 822, 824, 486 P.2d 1391 (1971).

In *State v. Shaw,* 201 Kan. 248, 250, 440 P.2d 570 (1968), this court denied a defendant's constitutional challenge to the Habitual Criminal Act stating:

"In any event we consider it a legislative function to fix and prescribe the penalties for violating the criminal statutes of this state, and not the concern of the courts. This principle was recognized by this court in *In re MacLean,* 147 Kan. 678, 78 P.2d 855, where we said:

" '. . . The rule is well settled that the power to define crimes and to prescribe punishment for their violation is the function of the legislature . . .' (p. 681.)

"The legislature has spoken in the case of the habitual criminal and we may not presume to interfere with its prerogative absent some clear infirmity which renders the sentence void. In the present case we perceive nothing about the sentence imposed by the trial court which may be said to violate any of the defendant's rights, constitutional or otherwise. This is true despite the discretion granted a trial court in sentencing a third time loser, but withheld where a second offender is concerned."

The first opinion where this court recognized a basis for reviewing an alleged disproportionate sentence was *State v. Coutcher,* 198 Kan. 282, 287, 424 P.2d 865 (1967), wherein we stated:

"As applied to the facts in this case, can it be said the sentence of eighteen years to the state penitentiary imposes a cruel and unusual punishment upon the appellant?

"While the prohibition of the Eighth Amendment to the United States Constitution has generally been considered to be directed against physical cruelty and torture, there is authority to the effect that it also may be invoked against excessively and disproportionately long prison sentences.

"The appellant relies upon this rule established years ago by the United States Supreme Court in *Weems v. United States,* 217 U.S. 349, 54 L.Ed. 793, 30 S.Ct. 544 (1910). In that opinion the court said:

" 'What constitutes a cruel and unusual punishment has not been exactly decided. It has been said that ordinarily the terms imply something inhuman and barbarous, torture and the like. *McDonald v. Commonwealth,* 173 Massachusetts, 322. The court, however, in that case conceded the possibility "that imprisonment in the State prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment.' . . .'" (p. 368.)

Our decisions discussing cruel and unusual punishment in the decade after *Coutcher* added little in the way of substantive analysis. The decisions upholding sentences under the Habitual Criminal Act consistently referred to the controlling nature of legislative enactments. In *State v. Pettay,* 216 Kan. 555, 558, 532 P.2d 1289 (1975), we held:

"When a sentence is fixed by the trial court within permissible limits of the applicable statutes the sentence is not erroneous. In the absence of special circumstances showing an abuse of judicial discretion it cannot be determined on appeal that such a sentence is excessive or so disproportionate to the offense as to constitute cruel and unusual punishment."

See *State v. Steward,* 219 Kan. 256, 270, 547 P.2d 773 (1976); *State v. Bradley,* 215 Kan. 642, 648, 527 P.2d 988 (1974); *State v. Collins,* 214 Kan. 247, 248, 519 P.2d 1396 (1974); *State v. Miles,* 213 Kan. 245, 247, 515 P.2d 742 (1973); *Cipolla v. State,* 207 Kan. at 824-25. No guidelines were developed to determine whether a particular sentence might be disproportionate or excessive.

We fully embraced the disproportionality analysis in *State v. Freeman,* 223 Kan. 362. Barbara Ann Freeman argued the mandatory minimum sentence imposed on persons who commit Article 34 crimes using a firearm constitutes cruel and unusual punishment. K.S.A. 1977 Supp. 21-4618. We responded to that argument by analyzing many court decisions, beginning with *Weems v. United States,* 217 U.S. 349, 54 L.Ed. 793, 30 S.Ct. 544 (1910) and *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed.2d 346, 92 S.Ct. 2726 (1972). We stated that whether a punishment is cruel and unusual must be determined on a case-by-case basis. In any event, the imposition of a mandatory sentence without right of probation and parole was not deemed cruel and unusual per se. *State v. Freeman,* 223 Kan. at 365.

The decision in *Freeman* made substantive additions to our concept of a disproportionate sentence as cruel and unusual punishment. As an underlying principle we stated:

"Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity. (*State v. Coutcher,* 198 Kan. 282, 287, 424 P.2d 865; *Cipolla v. State,* [207 Kan. 822] pp. 824-25; Anno: Cruel Punishment—Length of Sentence, 33 A.L.R.3d 335.)" 223 Kan. at 367.

The practical application of that principle was considered by the California Supreme Court in *In re Lynch,* 8 Cal. 3d 410, 424-29, 105 Cal. Rptr. 217, 503 P.2d 921 (1972). The California court relied on several United States Supreme Court decisions and devised three techniques to aid in administering the principle. In *Freeman* we adopted a modified version of the California court's three techniques, stating:

"In determining whether the length of a sentence offends the constitutional

prohibition against cruel punishment three techniques should be considered:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

Justice Powell, dissenting in *Rummel v. Estelle,* 445 U.S. at 285, recites three nearly identical "objective factors" which are included in disproportionality analysis.

*Rummel* is a retreat from the philosophy which spawned the three techniques recited in *Freeman.* The court in *Rummel* essentially rejects the proposition that disproportionality analysis is required by the 8th Amendment. The length of sentences imposed on felons is solely a legislative decision. As the *Rummel* dissent reflects, the factors enunciated in the three techniques of *Freeman* were derived from *Weems v. United States,* 217 U.S. 349, and the United States Supreme Court's death penalty cases. See *Rummel v. Estelle,* 445 U.S. at 285. See also *Coker v. Georgia,* 433 U.S. 584, 53 L.Ed.2d 982, 97 S.Ct. 2861 (1977); *Gregg v. Georgia,* 428 U.S. 153, 49 L.Ed.2d 859, 96 S.Ct. 2909 (1976); *Furman v. Georgia,* 408 U.S. 238; *In re Lynch,* 8 Cal. 3d at 425-29. The decisions involve "unique" punishments and are of "limited assistance" in deciding the constitutionality of a lengthy prison sentence. *Rummel v. Estelle,* 445 U.S. at 272. There is no need to compare a particular penalty with the punishment imposed for the same offense in other jurisdictions. "Absent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Rummell v. Estelle,* 445 U.S. at 282.

The *Rummel* decision forces this court to reconsider its reliance on the 8th Amendment prohibition against cruel or unusual punishment. According to *Rummel* we are not *required* by the 8th Amendment to question the length of prison sentences.

The fixing and prescribing of penalties for violating the criminal statutes of this state is considered a legislative function. See

*State v. Freeman,* 223 Kan. at 369; *Cipolla v. State,* 207 Kan. at 824; *State v. Shaw,* 201 Kan. at 250; *In re MacLean,* 147 Kan. 678, 681, 78 P.2d 855 (1938). A sentence within limits set by the legislature is presumed valid, but may be challenged as an abuse of trial court discretion. See *State v. Lovelace,* 227 Kan. 348, 354, 607 P.2d 49 (1980); *State v. Goering,* 225 Kan. 755, 761, 594.P.2d 194 (1979); *State v. Coe,* 223 Kan. 153, 167, 574 P.2d 929 (1977); *State v. Buckner,* 223 Kan. 138, 150, 574 P.2d 918 (1977); *State v. Steward,* 219 Kan. at 256. Trial judges must articulate the facts and factors considered by the court in imposing sentence. K.S.A. 1979 Supp. 21-4603(3); *State v. Goering,* 225 Kan. at 760-61; *State v. Buckner,* 223 Kan. at 151.

We now hold section 9 of the Kansas Bill of Rights may be invoked against an excessive or disproportionate sentence. The nature of a sentence as cruel or unusual encompasses duration. The techniques applied in *Freeman* will continue to guide our constitutional inquiry. *State v. Weigel,* 228 Kan. 194, 612 P.2d 636 (1980).

The sentence imposed on McDaniel is not excessive or disproportionate. In Kansas, aggravated robbery is a class B felony, the same as murder in the second degree. The trial court set McDaniel's minimum and maximum sentence at the lowest permissible. The minimum for a class B felony may be set at no less than five years nor more than fifteen years and the maximum shall be fixed by the court at not less than twenty years nor more than life. K.S.A. 1979 Supp. 21-4501. Aggravated robbery is committed regardless of whether anyone is injured by the firearm; it is an inherently dangerous felony. McDaniel was found guilty as a principal. He has indicated no great disparity between the punishment imposed for this crime in Kansas and in other jurisdictions. The small amount of money taken in the robbery has little bearing on the punishment imposed for this particular crime. If more money had been available the proceeds of the aggravated robbery probably would have been higher.

The judgment of the lower court is affirmed as to the appellant Joe McDaniel, but the conviction and judgment of Boyd S. Owens, Jr., is reversed and the case is remanded for a new trial.