Stegall, J., concurring:
Though the Kansas Supreme Court has never expressly called our method of constitutional interpretation "originalism," we have repeatedly and regularly affirmed originalist principles. Above all, these principles declare that law is not law which "bends" or "alters when it alteration finds." Like love, law qua law is not "Time's fool" but is rather "an ever-fixed mark." William Shakespeare, Sonnet 116.
Law's meaning must be fixed if it is to be the people's bulwark against arbitrary power manifest in the vicissitudes of time. This simple idea-the rule of law-has historically been the way our free society has vigorously insisted that we will not be governed by the whims of the mere men and women who happen, at any given moment, to have their hands on governmental levers. "[W]here ... is the king of America? ... [I]n America the law is king . For as in absolute governments the king is law, so in free countries the law ought to be king; and there ought to be no other." Paine, Common Sense 46 (1776).
This does not mean that the law cannot be changed. Of course it can. Our founding documents recognize the need for mechanisms of change and set forth detailed procedures by which the law can be altered when it alteration finds. But the meaning of a law-a statute or a constitutional provision-cannot change until the text of that law changes. Thus, our court has mostly insisted that the "meaning of a constitution is fixed when it is adopted, and afterward when the courts are called upon to interpret it they cannot assume that it bears any different meaning." (Emphasis added.) The State v. Sessions , 84 Kan. 856, 858, 115 P. 641 (1911).
*1286 Having established that the meaning of our Constitution is fixed at the time of its adoption, courts like ours are still left to articulate and enforce that meaning. To do so, we have made it clear that "ascertaining the meaning of constitutional provisions" requires us to go back to the "understanding of the people at their adoption." State ex rel. Frizzell v. Highwood Service, Inc. , 205 Kan. 821, 825-26, 473 P.2d 97 (1970). "Absent defining language, our constitution is deemed to mean what the words imply to a person's common understanding." KNEA v. State , 305 Kan. 739, 755-56, 387 P.3d 795 (2017). And not just any person's common understanding, but " ' "the understanding of the people when they adopted [the constitutional provision]." ' [Citations omitted.]" Solomon v. State , 303 Kan. 512, 523, 364 P.3d 536 (2015). "In ascertaining the meaning of a constitutional provision ... the court must examine the language used and consider it in connection with the general surrounding facts and circumstances that cause the amendment to be submitted." State ex rel. Stephan v. Finney , 254 Kan. 632, 654, 867 P.2d 1034 (1994). "[T]he test is ... the common understanding ... of the people at the time they adopted the constitutional provision and the presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who adopted them." State ex rel. Anderson v. Fadely , 180 Kan. 652, 659, 308 P.2d 537 (1957).
These two fundamental principles of constitutional interpretation together make up what scholars and jurists sometimes call "original public meaning" jurisprudence that prioritizes the "contemporaneously expressed understanding of ratified text." Barrett, Originalism and Stare Decisis , 92 Notre Dame L. Rev. 1921, 1924 (2017) (describing the two basic claims of originalism: "First, the meaning of constitutional text is fixed at the time of its ratification. Second, the original meaning of the text controls because 'it and it alone is law.' "). While jurisprudential debates have refined the theories and names we give different modes of constitutional interpretation, the basic ideas animating originalism are as old as our Republic. They make up the "traditional view that the Constitution bears its original meaning and is unchanging." McIntyre v. Ohio Elections Comm'n , 514 U.S. 334, 371-72, 115 S.Ct. 1511, 131 L.Ed. 2d 426 (1995) (Scalia, J., dissenting). This tradition directs that
" '[o]n every question of construction, [we should] carry ourselves back to the time when the Constitution was adopted; recollect the spirit manifested in the debates; and instead of trying [to find] what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed.' " McIntyre , 514 U.S. at 372, 115 S.Ct. 1511 (Scalia, J., dissenting) (quoting T. Jefferson, Letter to William Johnson [June 12, 1823], in 15 Writings of Thomas Jefferson 439, 449 [A. Lipscomb ed. 1904] ).
Simply put, "[w]ords must be given the meaning they had when the text was adopted." Scalia & Garner, Reading Law: The Interpretation of Legal Texts 78 (2012). Explaining this, Justice Scalia often emphasized the purpose of the law as an ever-fixed mark, intended "to embed certain rights in such a manner that future generations cannot readily take them away. A society that adopts a bill of rights is skeptical that 'evolving standards of decency' always 'mark progress,' and that societies always 'mature,' as opposed to rot." Scalia, A Matter of Interpretation: Federal Courts and the Law 40-41 (1997). "[O]ur Nation's protection, that fortress which is our Constitution, cannot possibly rest upon" the shifting sands of the "changeable philosophical predilections" of whoever happens to be in charge. Lee v. Weisman , 505 U.S. 577, 632, 112 S.Ct. 2649, 120 L.Ed. 2d 467 (1992) (Scalia, J., dissenting).
When other state supreme courts interpret their constitutions, most follow the same principle of interpretation by first positing the law's fixed meaning and then by looking to the public's common and ordinary understanding of the text at the time of its adoption to ascertain that meaning. See Christiansen, Originalism: The Primary Canon of State Constitutional Interpretation , 15 Geo. J.L. & Pub. Pol'y 341, 344 (2017) (conducting an exhaustive survey and concluding that "the supermajority of state supreme courts have expressly identified originalism as the *1287 primary canon of state constitutional interpretation").
The Utah Supreme Court, for example, has regularly said that courts should "look to the original meaning of the ... Constitution" and the "originalist inquiry must focus on ascertaining the 'original public meaning' of the constitutional text." Neese v. Utah Board of Pardons & Parole , 2017 UT 89, ¶¶ 67, 95, 416 P.3d 663 (2017). This interpretive method is "essential to any system of government that finds its legitimacy in the will of the people as expressed in positive laws." State v. Walker , 267 P.3d 210, 216-17 (2011) (Lee, J., concurring). Thus, "the judicial inquiry into original meaning" is of "crucial importance" though "[t]houghtful judges might understandably bristle at these restraints" on their power. 267 P.3d at 218-19 (Lee, J. concurring). "A judge on a court of last resort (like this one) may be especially prone to object to such a limited conception of his [or her] role...." 267 P.3d at 219 (Lee, J. concurring).
In Georgia, that state's supreme court has said "[w]e interpret a constitutional provision according to the original public meaning of its text, which is simply shorthand for the meaning the people understood a provision to have at the time they enacted it. This is not a new idea." Olevik v. State , 302 Ga. 228, 235, 806 S.E.2d 505 (2017).
"In determining the original public meaning of a constitutional provision, we consider the plain and ordinary meaning of the text, viewing it in the context in which it appears and reading the text in its most natural and reasonable manner. [Citation omitted.]....
....
"When we consider the original public meaning, we necessarily must focus on objective indicators of meaning, not the subjective intent of particular individuals...." 302 Ga. at 236-37, 806 S.E.2d 505.
Similarly, the Michigan Supreme Court says "[o]ur goal in construing our Constitution is to discern the original meaning attributed to the words of a constitutional provision by its ratifiers. [Citation omitted.]" People v. Nutt , 469 Mich. 565, 573, 677 N.W.2d 1 (2004). To do this, Michigan courts "apply the rule of 'common understanding[,]' " which means that "people are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding." 469 Mich. at 573, 677 N.W.2d 1 ; see People v. Tanner , 496 Mich. 199, 223, 853 N.W.2d 653 (2014) ( "The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.").
Even with these principles of constitutional interpretation firmly in hand, the conscientious judge will understand that all texts, even those "penned with the greatest technical skill" are "more or less obscure ... until their meaning be liquidated and ascertained by a series of particular discussions and adjudications." James Madison, The Federalist No. 37, p. 229 (Modern Library ed. 1969). Madison went on to articulate what every judge involved in constitutional interpretation learns from experience-that the "complexity of objects" served by the constitutional text and the "imperfection of the human faculties" leads often to "fresh embarrassment[s]" in any interpretive endeavor. The Federalist No. 37, p. 229. Even the commands of the "Almighty himself," Madison wryly notes, are "rendered dim and doubtful by the cloudy medium through which [they are] communicated." The Federalist No. 37, p. 230.
This Madisonian humility-attendant as it is to the indeterminacy of language and the difficulties of the interpretive process-must be considered a third, equally important leg of the originalist stool. As Justice Felix Frankfurter put it, because the judicial power is the "power of negation" rather than the "power to shape measures for dealing with the problems of society ... the indispensable judicial requisite is intellectual humility." A. F. of L. v. American Sash Co. , 335 U.S. 538, 557, 69 S.Ct. 260, 93 L.Ed. 222 (1949) (Frankfurter, J., concurring). In this, he echoed Justice David Brewer's comment that "[the courts] make no laws, they establish no policy, they never enter into the domain of popular action. ... Their functions in relation to the State are limited to seeing that popular *1288 action does not trespass upon ... [the] written constitutions." The Nation's Safeguard, Address Before the Sixteenth Annual Meeting of the New York State Bar Association 46 (January 1893). And years later, writing for the Court, Chief Justice Roberts would quote Justice Frankfurter to the same effect: " 'Whatever temptations the statesmanship of policy-making might wisely suggest,' the .... judge 'must not read in by way of creation,' but instead abide by the 'duty of restraint, th[e] humility of function as merely the translator of another's command.' " Jones v. Bock , 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed. 2d 798 (2007).
There is, however, another interpretive model lurking in our caselaw. Instead of law as an ever-fixed mark, this theory posits the Constitution as a servant of time. As times change, the thinking goes, so too must our interpretation of the law. Thus, as its meaning shifts to reflect vacillating social sensibilities, the Constitution becomes a kind of mood ring for the zeitgeist of the age. Moreover, this framework gives judges the power to announce the new colors of the constitutional text whenever the kaleidoscope of history turns.
Following this theory, we have declared that "the constitution must be given flexibility so that it may vibrate in tune with the vicissitudes of time. ... [But] the flexibility theory of constitutional construction should not be followed to the point of regarding the dominant document as being merely worthy of mention." State ex rel. Donaldson v. Hines , 163 Kan. 300, 301, 182 P.2d 865 (1947). We have said explicitly that constitutions "should march abreast of the times" and the constitutional text "must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress." Markham v. Cornell , 136 Kan. 884, 891, 18 P.2d 158 (1933) ; see also Postlethwaite v. Edson , 102 Kan. 619, 643, 171 P. 769 (1918) ("constitutions march, aided by judicial interpretation"). This vibrating, flexing, and marching constitution is more often simply referred to as a "living" constitution. Rummel v. Estelle , 445 U.S. 263, 307, 100 S.Ct. 1133, 63 L.Ed. 2d 382 (1980) (Powell, J., dissenting) ("We are construing a living Constitution.").
Is the meaning of our Constitution fixed or flexible? A great deal turns on how judges answer this question, and each answer finds at least some support in our prior decisions. In light of this mixed pedigree, it would behoove us to consider the question anew. The brief of reason, liberty, and experience argues forcefully in favor of a fixed meaning. The opposing brief of hubris, progress, and good intentions holds forth the enticing fruit of "flexibility." But we should resist the temptation. The problem with judges striving to pick up on vibrations emanating from a constitutional text as it yields to the march of progress is that the process tends to produce results we "just can't explain." Brian Wilson, Good Vibrations , on SMiLE (Nonesuch Records 2004).
Nowhere, perhaps, is this more powerfully illustrated than in the history of this court's interpretation of section 9 of the Kansas Constitution Bill of Rights. Adopted in 1859, section 9 states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." For years, this court interpreted section 9 to apply only to the type of punishment imposed, not whether the punishment was proportional to the crime of conviction:
"Imprisonment in the penitentiary at hard labor is not of itself a cruel or unusual punishment within the meaning of § 9 of the bill of rights of the constitution, for it is a kind of punishment which has been resorted to ever since Kansas has had any existence, and is a kind of punishment common in all civilized countries. That section of the constitution probably, however, relates to the kind of punishment to be inflicted, and not to its duration . Although the punishment in this case may be considered severe, and much severer indeed than the punishment for offenses of much greater magnitude, as adultery, or sexual intercourse coupled with seduction, yet we cannot say that the act providing for it is unconstitutional or void." (Emphasis added.) The State v. White , 44 Kan. 514, 520-21, 25 P. 33 (1890).
*1289 See also The State v. Gillmore , 88 Kan. 835, 845, 129 P. 1123 (1913) (hard labor for nonsupport by husband was not cruel or unusual punishment); In re Ellis , 76 Kan. 368, 375, 91 P. 81 (1907) (imprisonment for failure to pay costs taxed against a defendant is not cruel or unusual punishment).
But in 1910, the United States Supreme Court suggested the Eighth Amendment's prohibition on "cruel and unusual punishment" may contain a proportionality requirement. Weems v. United States , 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Prior to Weems , the Supreme Court interpreted "cruel and unusual punishment" to prohibit only certain types of punishment, not punishments that may be disproportionate to the actual crime committed. See In re Kemmler , 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890) ("Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."); Wilkerson v. Utah , 99 U.S. 130, 136, 25 L.Ed. 345 (1878) ("[I]t is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden."); see also Granucci, " Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning , 57 Cal. L. Rev. 839, 842 (1969) ("Attempts to extend the meaning of the clause to cover any punishment disproportionate to the crime were rebuffed throughout the nineteenth century.").
In Weems , the Supreme Court held a 15-year sentence of hard labor while chained at the feet and hands was cruel and unusual punishment when imposed on a government official convicted of falsifying records. 217 U.S. at 381, 30 S.Ct. 544. Discussing the "precept of justice that punishment for crime should be graduated and proportioned to offense," the Court noted commentators at the time argued the Eighth Amendment "may acquire meaning as public opinion becomes enlightened by a humane justice. [Citations omitted]." 217 U.S. at 367, 378, 30 S.Ct. 544. While scrutinizing the facts of the case, the Court considered how similar crimes were punished in other areas of the United States and held the sentence "exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice." 217 U.S. at 381, 30 S.Ct. 544.
Then, in Trop v. Dulles , 356 U.S. 86, 103, 78 S.Ct. 590, 2 L.Ed. 2d 630 (1958), the Supreme Court held that the denationalization of a U.S. citizen for wartime desertion violated the Eighth Amendment. Although the Supreme Court did not directly address the question of proportionality, Chief Justice Warren famously stated, "The Court recognized in [ Weems ] that the words of the Amendment are not precise, and that their scope is not static. The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 100-01, 78 S.Ct. 590.
These evolutions in the Supreme Court's Eighth Amendment jurisprudence apparently induced sympathetic vibrations in section 9. Beginning with State v. Coutcher , 198 Kan. 282, 424 P.2d 865 (1967), the Kansas Supreme Court signaled a change in how it would interpret section 9. Although we held 18-years' hard labor resulting from the operation of a recidivist statute was not cruel and unusual punishment, our predecessors observed:
"While the prohibition of the Eighth Amendment to the United States Constitution has generally been considered to be directed against physical cruelty and torture, there is authority to the effect that it also may be invoked against excessively and disproportionately long prison sentences." 198 Kan. at 287, 424 P.2d 865.
For support, the Coutcher court quoted a small portion of Weems in which the Supreme Court cited a Massachusetts Supreme Court case conceding the possibility that a long prison term " ' "might be so disproportionate to the offense as to constitute a cruel and unusual punishment." ' " Coutcher , 198 Kan. at 287-88, 424 P.2d 865 (quoting Weems , 217 U.S. at 368, 30 S.Ct. 544 [quoting McDonald v. Commonwealth , 173 Mass. 322, 328, 53 N.E. 874 (1899) ] ). Notably, Coutcher *1290 offered no discussion of the textual or historical differences between section 9 and the Eighth Amendment, evidently lumping the two together.
A decade later, we officially recognized a proportionality component of section 9 in State v. Freeman , 223 Kan. 362, 367, 574 P.2d 950 (1978). After briefly citing Weems and Furman v. Georgia , 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972), a death penalty case, the Freeman court announced three factors for courts to consider when deciding whether the length of a sentence constitutes a cruel punishment:
"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;
"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and
"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367, 574 P.2d 950.
In Rummel , a sharply divided Supreme Court purported to limit the Eighth Amendment's proportionality principle. Rummel v. Estelle , 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed. 2d 382 (1980). Faced with the implications of Rummel and our recently articulated Freeman factors, we again revisited the proportionality principle in State v. McDaniel & Owens , 228 Kan. 172, 184, 612 P.2d 1231 (1980). Initially, the McDaniel court recognized:
" Rummel is a retreat from the philosophy which spawned the three techniques recited in Freeman . The court in Rummel essentially rejects the proposition that disproportionality analysis is required by the 8th Amendment. The length of sentences imposed on felons is solely a legislative decision. As the Rummel dissent reflects, the factors enunciated in the three techniques of Freeman were derived from [ Weems ] and the United States Supreme Court's death penalty cases. [Citations omitted.]" 228 Kan. at 184, 612 P.2d 1231.
And while the McDaniel court stated Rummel "forces this court to reconsider its reliance on the 8th Amendment prohibition against cruel or unusual punishment," it proclaimed without any independent analysis of section 9 : "We now hold section 9 of the Kansas Bill of Rights may be invoked against an excessive or disproportionate sentence. The nature of a sentence as cruel or unusual encompasses duration. The techniques applied in Freeman will continue to guide our constitutional inquiry." 228 Kan. at 184-85, 612 P.2d 1231. As such, McDaniel "found that a disproportionately long prison term could violate the Kansas Constitution, even though it would not violate the federal constitution at that particular time." State v. Lawson , 296 Kan. 1084, 1092, 297 P.3d 1164 (2013) (summarizing McDaniel 's response to Rummel ). The McDaniel court purported to interpret section 9 without once even considering the actual meaning or history of the text of our Constitution.
Three years later, Eighth Amendment jurisprudence flipped again as the minority in Rummel became the majority of the Court when Justice Blackmun changed his vote in Solem v. Helm , 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed. 2d 637 (1983). Like Rummel, Solem was convicted of a relatively minor felony relating to fraud and was sentenced under a recidivist statute. But unlike Rummel, Solem's life sentence lacked the possibility of parole. Contending this distinction was dispositive, the Supreme Court seized the opportunity to reinstate its proportionality principle. See 463 U.S. at 290-92, 297, 103 S.Ct. 3001.
The modern-day debate over proportionality stems from the Supreme Court's subsequent tack in Harmelin v. Michigan , 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed. 2d 836 (1991). The only majority reached by the justices in Harmelin was for the outcome-the Michigan law in question imposing a *1291 mandatory life sentence without parole for possession of at least 650 grams of cocaine did not violate the Eighth Amendment. 501 U.S. at 994-96, 111 S.Ct. 2680. The justices divided, however, on what role, if any, proportionality should play in the analysis.
Justice Scalia and Chief Justice Rehnquist concluded that the original meaning of the Eighth Amendment did not include a proportionality principle. 501 U.S. at 985, 111 S.Ct. 2680 ; see also Ewing v. California , 538 U.S. 11, 31, 123 S.Ct. 1179, 155 L.Ed. 2d 108 (2003) (Scalia, J., concurring in the judgment) ("In my opinion in [ Harmelin ], I concluded that the Eighth Amendment's prohibition of 'cruel and unusual punishments' was aimed at excluding only certain modes of punishment, and was not a 'guarantee against disproportionate sentences.' Out of respect for the principle of stare decisis , I might nonetheless accept the contrary holding of [ Solem ]-that the Eighth Amendment contains a narrow proportionality principle-if I felt I could intelligently apply it.").
Justice Kennedy, joined by Justices O'Connor and Souter, argued for a "narrow proportionality principle" in "noncapital sentences." Harmelin , 501 U.S. at 997-1001, 111 S.Ct. 2680 (Kennedy, J., concurring). And the Kennedy approach has subsequently held sway. See Miller v. Alabama , 567 U.S. 460, 469, 132 S.Ct. 2455, 183 L.Ed. 2d 407 (2012) (stating that " '[t]he concept of proportionality' " is viewed "less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society" ' "); Graham v. Florida , 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed. 2d 825 (2010) ("For the most part ... the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime."); Ewing , 538 U.S. at 23-24, 123 S.Ct. 1179 (plurality opinion) ("The proportionality principles in our cases distilled in Justice Kennedy's concurrence guide our application of the Eighth Amendment in the new context that we are called upon to consider.").
Back in Kansas, in Harmelin 's wake, we modified our "cruel or unusual" jurisprudence again, announcing that we would no longer use the Freeman factors to analyze challenges to the method of punishment rather than the length of a sentence. See State v. Scott , 265 Kan. 1, 9, 961 P.2d 667 (1998) ("While there may still be instances where the Freeman test should be applied, we will not apply it precisely here where the method of punishment, rather than the length of a sentence, is challenged as cruel or unusual. Neither this court nor the Supreme Court has applied such test outside of the length of sentence context."), abrogated on other grounds by Smith v. Doe , 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed. 2d 164 (2003) ; see also State v. Kleypas , 272 Kan. 894, 1032-33, 40 P.3d 139 (2001) (stating Scott "severely limited the application of the Freeman factors" and the test only applies where the length of a sentence is challenged) overruled in part on other grounds by Kansas v. Marsh , 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed. 2d 429 (2006).
Currently, we formulate our judicially created proportionality principle as follows: " 'Under § 9 of the Kansas Constitution Bill of Rights, a punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " State v. Spear , 297 Kan. 780, 799, 304 P.3d 1246 (2013) ; see also State v. Funk , 301 Kan. 925, 943, 349 P.3d 1230 (2015) ( "[L]ifetime postrelease supervision is not so disproportionate a punishment to an 18- or 19-year-old man's participation in a sex act with a 14-year-old girl that the punishment is shocking to the conscience or offensive to fundamental notions of human dignity."); State v. Toahty-Harvey , 297 Kan. 101, 106, 298 P.3d 338 (2013) ("Toahty-Harvey challenges the length of time he was ordered to be on postrelease supervision, rather than complaining that postrelease supervision is a cruel or unusual method of punishment.").
Notably, none of this caselaw makes any effort to analyze the text of section 9, the history or context of its drafting and ratification, or the common and ordinary understanding of the words used at the time of ratification. The Freeman factors are little more than free-floating codicils to the Constitution, *1292 adopted and frequently revised over the past forty years by this court. The "flexibility theory of constitutional construction" has been followed to the point of "regarding the dominant document" as being not even "worthy of mention." Hines , 163 Kan. at 301, 182 P.2d 865.
Recently, however, we did return in a different context to the text and history of section 9. In State v. Petersen-Beard , 304 Kan. 192, 209-10, 377 P.3d 1127, cert. denied --- U.S. ----, 137 S.Ct. 226, 196 L.Ed.2d 175 (2016), we interpreted the word "punishment" in section 9 and at least considered whether there existed any "textual or historical evidence that the drafters of § 9 intended the meaning of 'punishment' to differ from the same word's meaning as used in the Eighth Amendment."
Nonetheless, for now the Freeman factors are the law of Kansas in cases such as the one now before us. I do not fault today's majority for deciding the case on these grounds, and I join that decision. It would be imprudent, in my view, to consider a wholesale revision of our section 9 jurisprudence without first hearing well developed and briefed arguments from the parties and any interested amici.
Kansas Supreme Court Justice Harold Fatzer once warned that no matter how we
" 'interpret the provisions of the Constitution, it is still the Constitution which is the law and not the decision of the Court. ...
....
" '[T]he Judiciary should always be pervious to demonstration of judicial error as to the original meaning of the Constitution, and be prepared to correct its own mistakes.' " Harris v. Anderson , 194 Kan. 302, 314-15, 400 P.2d 25 (1965) (Fatzer, J., dissenting) (quoting 3 Warren, The Supreme Court in United States History 470-71 [1922] ).
While there is much to be said for this view, there are countervailing principles of stare decisis that must be considered. And while I think that, as one judge put it recently, the original meaning of the Constitution should "prevail over slavish devotion to judge-made, form-over-substance, multi-factor tests" such as we have in Freeman , I am not willing to prematurely declare that in this area of our constitutional jurisprudence we have "miss[ed] the constitutional forest for the judge-planted trees." ETC Marketing v. Harris County , 528 S.W.3d 70, 90 (Tex. 2017) (Brown, J., concurring).
That said, the argument that the original meaning of the text of section 9 does not include a proportionality principle appears strong. A cursory review of the circumstances surrounding its adoption suggests the framers and ratifiers of our Constitution never thought they were including a proportionality principle. As we have often recognized, the Kansas Constitution was modeled after the 1851 Ohio Constitution. See, e.g., Petersen-Beard , 304 Kan. at 210, 377 P.3d 1127. The 1851 Ohio Constitution did not contain a proportionality clause. See Ohio Const. art. I, § 9 (1851). This is significant for two reasons. First, several other state constitutions from that era contained proportionality clauses. See W. Va. Const. art. III, § 5 (1872) ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Penalties shall be proportioned to the character and degree of the offence."); Ga. Const. art. I, § 21 (1868) ("All penalties shall be proportioned to the nature of the offence."); Ind. Const. art. I, § 16 (1851) ("Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offence."); R.I. Const. art. I, § 8 (1842) ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and all punishments ought to be proportioned to the offence."); Me. Const. art. I, § 9 (1820) ("Sanguinary laws shall not be passed: all penalties and punishments shall be proportioned to the offence: excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted.").
Second-and closer to the mark-prior to the 1851 revisions to the Ohio Constitution, that state's constitution also explicitly set forth a proportionality requirement:
*1293 "All penalties shall be proportioned to the nature of the offence. No wise legislature will affix the same punishment to the crimes of theft, forgery, and the like, which they do to those of murder and treason. When the same undistinguished severity is exerted against all offences, the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do the lightest offences. For the same reasons, a multitude of sanguinary laws are both impolitic and unjust; the true design of all punishments being to reform, not to exterminate, mankind." Ohio Const. art. VIII, § 14 (1802).
What we can surmise from this historical record-and from the fact that our Constitution followed the Ohio impulse of 1851 by excluding a proportionality clause-is a question for another day. The parties have not briefed this issue, so it is not properly before us. See State v. Meredith , 306 Kan. 906, 909, 399 P.3d 859 (2017) (an issue not briefed is waived or abandoned). It is sufficient at this point to observe that it is possible our Freeman based proportionality jurisprudence has no footing in the actual text and history of section 9 of the Kansas Constitution Bill of Rights. Thus, while I concur with and join today's decision, I write here in the hopes of recovering "the dominant document" as something quite a bit more than a dust covered anachronism, forgotten by the march of progress, meriting only a "mere [ ] ... mention." Hines , 163 Kan. at 301, 182 P.2d 865.