IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,746

STATE OF KANSAS,
*Appellant,*

V.

JOHNATHAN L. RIFFE,
*Appellee.*

SYLLABUS BY THE COURT

1.

Section 9 of the Kansas Constitution Bill of Rights prohibits any punishment that, although not cruel or unusual in its method, is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.

2.

Kansas courts consider the following three factors from *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978), when analyzing whether a sentence is so disproportionate that it is constitutionally impermissible under section 9 of the Kansas Constitution Bill of Rights: (1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment; (2) a comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question, the

1

challenged penalty is to that extent suspect; and (3) a comparison of the penalty with punishments in other jurisdictions for the same offense.

3.

No one factor of the *Freeman* test controls, and a court must address all three factors in its analysis.

4.

An appellate court reviews the district court's factual findings regarding the *Freeman* factors for substantial competent evidence. It reviews the legal conclusions drawn from those factual findings de novo.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 11, 2016. Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed June 8, 2018. Judgment of the Court of Appeals vacating the sentence and remanding the case is reversed. Judgment of the district court is reversed, and the case is remanded to the district court with directions.

*Daniel D. Gilligan,* assistant district attorney, argued the cause, and *Stephen D. Maxwell*, senior assistant district attorney, *Keith E. Schroeder,* district attorney, and *Derek Schmidt,* attorney general, were on the brief for appellant.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

ROSEN, J.: Johnathan L. Riffe contends a sentence of lifetime postrelease supervision would be unconstitutional as applied to him. The district court agreed, and as a result ordered a reduced term of 10 years of postrelease supervision. The Court of Appeals reversed and directed the district court to impose lifetime postrelease

supervision. We conclude that the district court made a legal error in its analysis and the Court of Appeals erred when it did not remand the case for consideration under the proper standard. We therefore reverse the Court of Appeals and remand to the district court with directions.

FACTUAL AND PROCEDURAL BACKGROUND

On October 30, 2010, Riffe went to a bar called Grand Slam that was attached to a Ramada hotel. There, he met C.H. Events from that night led to Riffe's conviction of aggravated sexual battery. C.H. and Riffe have different accounts of what occurred. We include both of their accounts and a description of the events that took place after the police became involved.

*C.H.'s description*

C.H. testified that at some point during the night, she decided she wanted to leave Grand Slam and go home, and Riffe offered to give her a ride. C.H. accepted the ride, and she and Riffe got in his truck and left the bar. C.H. began giving Riffe directions to her house. Riffe eventually stopped following C.H.'s directions and pulled into a parking lot, where he stopped his truck. Riffe dragged C.H. out of the truck by her hair and began ripping C.H.'s clothing off of her. Riffe pinned C.H. against the back of the truck and slammed her head into the tailgate. Riffe then undid his pants and tried to rape C.H. while she scratched and fought him. C.H. eventually kicked Riffe, got away, and began running until she found a motel. C.H. ran into the motel crying for help.

3

*Riffe's description*

Riffe testified that C.H. talked and flirted with him throughout the night while the two were at Grand Slam. Riffe and C.H. went outside the bar to the patio and began kissing and "heavy petting," and C.H. told him they should leave together. After trying, unsuccessfully, to enter Riffe's friend's hotel room at the Ramada, Riffe and C.H. got into Riffe's truck, and C.H. began giving him driving directions. C.H. began undressing until she was only wearing a bra and jacket. C.H. indicated that she and Riffe could not go to her house, and Riffe understood this to mean that she lived with her parents.

Riffe eventually stopped the truck in a parking lot so he could urinate. After he urinated, Riffe walked to the passenger side of the truck and opened the door. C.H. fell out, head first, onto the concrete. Riffe decided C.H. was so intoxicated that he should get her dressed and take her home, so he moved her to the tailgate of the truck to dress her. When Riffe tried to put her underwear on her, C.H. became upset and kicked him. Riffe told C.H. that he had to get her dressed before he took her home, but C.H. started swinging at him and then jumped out of the truck. Riffe sat down on the tailgate to collect himself, and when he got up and walked around the truck, C.H. was gone. Riffe began driving around looking for C.H. When he could not find her, he returned to the bar to ask his friends and C.H.'s friends to help him look for her. When Riffe got to the bar, C.H.'s friends were not there, and his friend was too drunk to help, so Riffe decided to stay at the bar and have a few drinks and wait for someone who knew C.H. Eventually, Riffe decided he was too drunk to drive around looking for C.H. so he returned to the Ramada where he was staying.

*After C.H. arrived at the motel*

When C.H. arrived at the motel, police were called and officers responded. C.H. had red areas on her neck, marks on her stomach and pant line, and bumps along her hairline. One of the officers located Riffe in the parking lot of the Ramada and observed a woman's shoes and tights on the passenger seat of Riffe's truck. He had earlier located C.H.' other clothes in the parking lot where Riffe had stopped his truck. Another officer spoke with Riffe and observed a bleeding scratch on Riffe's neck. C.H. eventually arrived at the Ramada and identified Riffe as her attacker.

Riffe was charged with aggravated kidnapping, attempted rape, and aggravated sexual battery. The jury acquitted Riffe of aggravated kidnapping and attempted rape but convicted him of aggravated sexual battery. On September 30, 2011, the district court sentenced Riffe to 47 months of imprisonment and 24 months of postrelease supervision.

On September 17, 2014, the State filed a motion to correct an illegal sentence, arguing that Riffe should have been sentenced to lifetime postrelease supervision pursuant to K.S.A. 2010 Supp. 22-3717(d)(1)(G). Riffe filed a response challenging the constitutionality of lifetime postrelease supervision as applied to him. He argued that the sentence would be cruel and unusual punishment under the Eighth Amendment to the United States Constitution and section 9 of the Kansas Constitution Bill of Rights.

At a resentencing hearing, the parties argued the constitutionality of lifetime postrelease as it applied to Riffe but presented no evidence. After hearing counsel's arguments, the district court concluded that lifetime postrelease supervision was unconstitutional under the Kansas Constitution as applied to Riffe. However, instead of denying the State's motion and leaving in place the originally imposed term of 24 months, the court resentenced Riffe to a period of 10 years' postrelease supervision, deeming that

5

to be the "outer limits of what would constitute punishment that is not constitutionally cruel and unusual and will protect society." In response to the State's request that the district judge elaborate on his factual findings and legal conclusions, the district judge filed the following "Findings of Fact" after concluding the hearing:

"The Defendant following jury trial was convicted of the offense of Aggravated Sexual Battery. The Defendant was found not guilty of the offenses of Aggravated Kidnapping and Attempted Rape. On September 30, 2011, the Defendant was sentenced to the aggravated guidelines sentence of 47 months in the custody of the Secretary of Corrections. The Defendant's motions for durational and dispositional departure were denied and the sentence was served.

"The Defendant was also sentenced to a postrelease term of 24 months. The presentence investigation listed 24 months as the appropriate term of postrelease. The Kansas legislature had previously amended K.S.A. 22-3717 to require lifetime postrelease for convictions of sexually related offenses. Apparently the amendment was made late in the legislative session not providing time for the amendment to be included in legislative updates to attorneys, judges, and court service offices.

"Presentence reports were prepared erroneously in relation to postrelease for a period of several years without the error being noticed or corrected by either trial judges, attorneys, or court service officers. It appears over the last several years in excess of 800 cases statewide were improperly sentenced without a lifetime postrelease being imposed as required by the amended statute.

"The above captioned matter is one such case. To correct the error, the Defendant was resentenced to correct the illegal sentence on April 27, 2015. Prior to the resentencing the Defendant filed a motion to attack the constitutionally [*sic*] of imposing a lifetime postrelease.

"An attack on the constitutionality of lifetime postrelease can be made on either of two grounds, categorically or case specific. Numerous appellate cases have dealt with

6

the categorical constitutional attack and have upheld the constitutionality of 22-3717 on that ground. The court found a lifetime postrelease under the fact specifics of this case would be unconstitutional utilizing the rationale as set out in STATE v. PROCTOR, 47 Kan. App. 2d 889 (2012)[.] After argument of counsel, the Court resentenced the Defendant to a ten year postrelease indicating the Court's factual findings would be filed of record.

"The Court in no way minimizes the seriousness of the crime of conviction. The Court imposed the aggravated sentence and denied motions for durational and dispositional departure. The sentence was served.

"The Defendant was not convicted by jury of the charged offenses of Aggravated Kidnapping and Attempted Rape. The post release for Aggravated Sexual Battery was increased from two years to life by the amendment of 22-3717. The Defendant would have fallen in a border box on the sentencing grid had it not been for a pair of twenty-two year old convictions for burglary and drugs. Past the age of 18 the Defendant had no felony convictions until the present crime of conviction. He is now in his early to mid 40s being 39 at the time of the commission of the offense.

"Since the commission of the offense the Defendant has gotten married. He has custody of and has raised and is raising two sons from a prior marriage. He has a good work history. The Defendant is required to register as a sex offender. The goal of lifetime postrelease in regard to sexual crimes is to prevent recidivism. The Defendant does not have a history of sex crimes beyond the present crime of conviction. At the time of the offense he was not married, had been working out-of-state and was at a bar prior to the offense. The Defendant had no problems in prison or on postrelease.

"Again, the factors do not mitigate the seriousness of the offense but indicate the Defendant is not a repeat sex offender or an incorrigible recidivist."

The State appealed the district court's decision. The Court of Appeals concluded that lifetime postrelease supervision was constitutional, vacated in part the sentence, and remanded with directions to impose lifetime postrelease supervision. *State v. Riffe*,

7

No. 113,746, 2016 WL 937869 (Kan. App. 2016) (unpublished opinion). Riffe petitioned for this court's review, arguing that the Court of Appeals erred when it reached the merits of the State's argument because the State failed to comply with Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34). In the alternative, Riffe argued that the Court of Appeals erred because the panel reweighed evidence, relied on improper factual findings, and addressed an argument that the State had abandoned. We granted Riffe's petition for review.

ANALYSIS

First, we briefly address Riffe's contention that the Court of Appeals should not have reached the merits of the State's argument. Riffe argues that the State failed to comply with Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 35), which provides:

"An appellant's brief must contain the following:

. . . .

(5) "The arguments and authorities relied on, separated by issue if there is more than one. Each issue must begin with . . . a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court."

We cannot discern from Riffe's arguments how he believes the State failed to comply with the rule, which requires a party to explain why it is raising a new issue on appeal. Because the State raised no new issues in its appellate brief, we conclude that it adequately preserved its issues for review and conformed to the rule.

8

Because there is no procedural bar, we move on to the merits of the issue. Riffe contends that the district court properly analyzed the constitutionality of his postrelease supervision term and argues that the Court of Appeals erred when it disagreed and vacated that portion of his sentence.

Section 9 of the Kansas Constitution Bill of Rights prohibits cruel or unusual punishment. "This prohibition includes any punishment that 'although not cruel or unusual in its method . . . [is] so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" *State v. Funk*, 301 Kan. 925, 933, 349 P.3d 1230 (2015) (quoting *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 [1978]).

Kansas courts consider three factors when analyzing whether a sentence is so disproportionate that it is constitutionally impermissible under section 9:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." *Freeman,* 223 Kan. at 367.

No one factor of the *Freeman* test controls, and a court must address all three factors in its analysis. *State v. Ortega-Cadelan*, 287 Kan. 157, 161, 194 P.3d 1195 (2008).

An appellate court reviews the district court's factual findings for substantial competent evidence. It reviews the legal conclusions drawn from those factual findings de novo. *Funk*, 301 Kan. at 933.

Here, the district court acknowledged the three *Freeman* factors before concluding that the first *Freeman* factor weighed for Riffe and the second two factors did not apply. Based on this conclusion, the district court ruled in Riffe's favor.

In the Court of Appeals, the State argued that the district court's factual findings were not supported by substantial competent evidence and that the district court made legal errors when it concluded factor one weighed for Riffe and failed to consider the final two factors.

The Court of Appeals panel concluded that most of the district court's factual findings were supported by substantial competent evidence but held that the facts actually indicated that factor one weighed in the State's favor, not Riffe's, as the district court had concluded. *Riffe*, 2016 WL 937869, at *7, 10. Regarding the second two factors, the panel construed the district court's decisions that the factors did not "apply" as conclusions that those factors weighed for the State. *Riffe*, 2016 WL 937869, at *10-11. The panel agreed with those conclusions. Because it considered all three factors to weigh in the State's favor, the panel reversed the district court's decision. *Riffe*, 2016 WL 937869, at *13.

Before this court, Riffe asserts that the panel's decision should be reversed because it erred in the following ways: by reweighing evidence when analyzing the first *Freeman* factor; by relying on the fact that the district court imposed an aggravated prison sentence when analyzing the first *Freeman* factor; and by addressing the second and third *Freeman* factors when the State did not analyze those factors in its brief.

We agree that the Court of Appeals should be reversed, but we base our decision on slightly different reasoning. We conclude that the district court made insufficient factual findings regarding factor one and made a legal error when it disregarded factors two and three. Based on these errors, the panel should have remanded the case to the district court for consideration under the proper legal standard rather than using its own judgment to fill in the holes created by a deficient trial court record.

When considering the first *Freeman* factor, a court should make factual findings regarding "[t]he nature of the offense and the character of the offender . . . with particular regard to the degree of danger present to society." 223 Kan. at 367. As we have noted, "relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment." 223 Kan. at 367.

From the district court's factual findings, it appears the court focused mainly on why it originally imposed the incorrect sentence and very little on Riffe's character and the likelihood that he would reoffend. It is unclear whether the court considered the facts of the crime, its violent or nonviolent nature, Riffe's culpability for the injury, or the many purposes of postrelease supervision—"retribution, deterrence, incapacitation, and rehabilitation." *State v. Mossman*, 294 Kan. 901, 912, 281 P.3d 153 (2012). These are integral considerations because they speak not only to the degree of danger a defendant

11

may pose to society, but also to the proportionality of the offense as it relates to the crime.

We are cognizant of the fact that we generally presume a district court made the necessary findings to support its conclusion when a party did not object to insufficient findings in the district court. See *State v. Longoria*, 301 Kan. 489, 506, 343 P.3d 1128 (2015). However, we have also said that we cannot follow that model "[w]hen the record on appeal does not support such a presumption." *Progressive Products*, *Inc. v. Swartz*, 292 Kan. 947, 961-62, 258 P.3d 969 (2011). In such a case, we "must remand for additional factual findings and legal conclusions." *Progressive Products*, 292 Kan. at 962.

We face that scenario here. The State presented evidence of a violent crime that left a traumatized victim. While the jury did not find Riffe guilty of attempted rape, it did find him guilty of aggravated sexual battery, proving that it believed most of the victim's testimony. And the district judge was clearly aware of the violent nature of the offense— at the resentencing hearing, he stated

> "had I tried the case myself to the bench I probably would have found not guilty on the aggravated kidnapping, guilty on the attempted rape and the aggravated sexual battery. Even without Mr. Riffe's prior convictions for the burglary and LSD occurring back in 1989, had there been no prior we would have been dealing with, rather than a presumptive prison case, but a case of safety of the community. The court has no doubt that I would have found that the imposition of the prison sentence was appropriate."

In light of the factual record and the district judge's comments, we cannot presume that the district court made the findings necessary to support its conclusion that the nature of the offense and Riffe's character suggested lifetime postrelease supervision was unconstitutional.

12

Regarding the final two factors, the district court informed the parties that "[t]he court has dealt with this issue primarily involved with child sex offenses. As to the two factors concerning proportionality and the offense comparted to other offenses in the State of Kansas, the court will find those do not apply." In its findings of fact, the judge described factual findings related to Riffe's character, but did not discuss factors two or three.

It is clear that the district judge did not conclude that the final two factors weighed for the State, as the Court of Appeals concluded. The language reveals that the district court purposefully disregarded these factors when conducting its analysis.

We have explained many times that a court must consider all three *Freeman* factors in its analysis. See, e.g., *State v. Boleyn*, 297 Kan. 610, 629-30, 303 P.3d 680 (2013); *State v. Britt*, 295 Kan. 1018, 1032, 287 P.3d 905 (2012); *State v. Woodard*, 294 Kan. 717, 723, 280 P.3d 203 (2012); *Ortega-Cadelan*, 287 Kan. at 161. And all three factors are certainly relevant in this case. Riffe presents no argument as to why the court should not compare his punishment against punishments for more serious offenses and punishments in other jurisdictions for the same offense. We agree with the State's assertion that the district court made a legal error when it considered only one of the *Freeman* factors in its constitutional analysis.

Given the errors in the courts below, we must remand this case to the district court for the purpose of using the proper legal standard to consider whether lifetime postrelease supervision is unconstitutional under section 9 of the Kansas Constitution Bill of Rights as it applies to Riffe. We direct the district court to look to the record or conduct a new evidentiary hearing, at its discretion, to make new and complete factual findings that are consistent with the guidance provided in *Freeman*. We note that the Court of Appeals

13

concluded that some of the factual findings were not supported by substantial competent evidence and therefore caution the district court to ensure that its findings are based on the evidence presented by the parties, not the arguments submitted by the attorneys. We further direct the district court to consider all three factors in its analysis.

Reversed and remanded with directions.

* * *

JOHNSON, J., concurring in part and dissenting in part:  I concur with the majority's decision to remand to the district court for consideration of the second and third *Freeman* factors, given our precedent requiring analysis of all three factors. See *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). But I disagree with the majority's determination that the district court's findings with respect to the first *Freeman* factor were insufficient.

* * *

STEGALL, J., concurring:  Though the Kansas Supreme Court has never expressly called our method of constitutional interpretation "originalism," we have repeatedly and regularly affirmed originalist principles. Above all, these principles declare that law is not law which "bends" or "alters when it alteration finds." Like love, law qua law is not "Time's fool" but is rather "an ever-fixed mark." William Shakespeare, Sonnet 116.

Law's meaning must be fixed if it is to be the people's bulwark against arbitrary power manifest in the vicissitudes of time. This simple idea—the rule of law—has historically been the way our free society has vigorously insisted that we will not be governed by the whims of the mere men and women who happen, at any given moment, to have their hands on governmental levers. "[W]here . . . is the king of America? . . . [I]n

14

America *the law is king*. For as in absolute governments the king is law, so in free countries the law ought to be king; and there ought to be no other." Paine, Common Sense 46 (1776).

This does not mean that the law cannot *be* changed. Of course it can. Our founding documents recognize the need for mechanisms of change and set forth detailed procedures by which the law can be altered when it alteration finds. But the *meaning* of a law—a statute or a constitutional provision—cannot change until the text of that law changes. Thus, our court has mostly insisted that the "meaning of a constitution is *fixed* when it is adopted, and afterward when the courts are called upon to interpret it they cannot assume that it bears any different meaning." (Emphasis added.) *The State v. Sessions*, 84 Kan. 856, 858, 115 P. 641 (1911).

Having established that the meaning of our Constitution is fixed at the time of its adoption, courts like ours are still left to articulate and enforce that meaning. To do so, we have made it clear that "ascertaining the meaning of constitutional provisions" requires us to go back to the "understanding of the people at their adoption." *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, 825-26, 473 P.2d 97 (1970). "Absent defining language, our constitution is deemed to mean what the words imply to a person's common understanding." *KNEA v. State*, 305 Kan. 739, 755-56, 387 P.3d 795 (2017). And not just any person's common understanding, but "'"the understanding of the people when they adopted [the constitutional provision].'" [Citations omitted.]" *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015). "In ascertaining the meaning of a constitutional provision . . . the court must examine the language used and consider it in connection with the general surrounding facts and circumstances that cause the amendment to be submitted." *State ex rel. Stephan v. Finney*, 254 Kan. 632, 654, 867 P.2d 1034 (1994). "[T]he test is . . . the common understanding . . . of the people at the time they adopted the constitutional provision and the presumption is in favor of the natural and popular

meaning in which the words are usually understood by the people who adopted them." *State, ex rel., v. Fadely*, 180 Kan. 652, 659, 308 P.2d 537 (1957).

These two fundamental principles of constitutional interpretation together make up what scholars and jurists sometimes call "original public meaning" jurisprudence that prioritizes the "contemporaneously expressed understanding of ratified text." Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1924 (2017) (describing the two basic claims of originalism: "First, the meaning of constitutional text is fixed at the time of its ratification. Second, the original meaning of the text controls because 'it and it alone is law.'"). While jurisprudential debates have refined the theories and names we give different modes of constitutional interpretation, the basic ideas animating originalism are as old as our Republic. They make up the "traditional view that the Constitution bears its original meaning and is unchanging." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 371-72, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) (Scalia, J., dissenting). This tradition directs that

> "'[o]n every question of construction, [we should] carry ourselves back to the time when the Constitution was adopted; recollect the spirit manifested in the debates; and instead of trying [to find] what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed.'" *McIntyre*, 514 U.S. at 372 (Scalia, J., dissenting) (quoting T. Jefferson, Letter to William Johnson [June 12, 1823], in 15 Writings of Thomas Jefferson 439, 449 [A. Lipscomb ed. 1904]).

Simply put, "[w]ords must be given the meaning they had when the text was adopted." Scalia & Garner, Reading Law: The Interpretation of Legal Texts 78 (2012). Explaining this, Justice Scalia often emphasized the purpose of the law as an ever-fixed mark, intended "to embed certain rights in such a manner that future generations cannot readily take them away. A society that adopts a bill of rights is skeptical that 'evolving standards of decency' always 'mark progress,' and that societies always 'mature,' as

16

opposed to rot." Scalia, A Matter of Interpretation: Federal Courts and the Law 40-41 (1997). "[O]ur Nation's protection, that fortress which is our Constitution, cannot possibly rest upon" the shifting sands of the "changeable philosophical predilections" of whoever happens to be in charge. *Lee v. Weisman*, 505 U.S. 577, 632, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992) (Scalia, J., dissenting).

When other state supreme courts interpret their constitutions, most follow the same principle of interpretation by first positing the law's fixed meaning and then by looking to the public's common and ordinary understanding of the text at the time of its adoption to ascertain that meaning. See Christiansen, *Originalism: The Primary Canon of State Constitutional Interpretation*, 15 Geo. J.L. & Pub. Pol'y 341, 344 (2017) (conducting an exhaustive survey and concluding that "the supermajority of state supreme courts have expressly identified originalism as the primary canon of state constitutional interpretation").

The Utah Supreme Court, for example, has regularly said that courts should "look to the original meaning of the . . . Constitution" and the "originalist inquiry must focus on ascertaining the 'original public meaning' of the constitutional text." *Neese v. Utah Board of Pardons & Parole*, 2017 UT 89, ¶¶ 67, 95, ___ P.3d ___ (2017). This interpretive method is "essential to any system of government that finds its legitimacy in the will of the people as expressed in positive laws." *State v. Walker*, 267 P.3d 210, 216-17 (2011) (Lee, J., concurring). Thus, "the judicial inquiry into original meaning" is of "crucial importance" though "[t]houghtful judges might understandably bristle at these restraints" on their power. 267 P.3d at 218-19 (Lee, J. concurring). "A judge on a court of last resort (like this one) may be especially prone to object to such a limited conception of his [or her] role . . . ." 267 P.3d at 219 (Lee, J. concurring).

In Georgia, that state's supreme court has said "[w]e interpret a constitutional provision according to the original public meaning of its text, which is simply shorthand for the meaning the people understood a provision to have at the time they enacted it. This is not a new idea." *Olevik v. State*, 302 Ga. 228, 235, 806 S.E.2d 505 (2017).

"In determining the original public meaning of a constitutional provision, we consider the plain and ordinary meaning of the text, viewing it in the context in which it appears and reading the text in its most natural and reasonable manner. [Citation omitted.] . . . .

. . . .

"When we consider the original *public* meaning, we necessarily must focus on objective indicators of meaning, not the subjective intent of particular individuals . . . ." 302 Ga. at 236-37.

Similarly, the Michigan Supreme Court says "[o]ur goal in construing our Constitution is to discern the original meaning attributed to the words of a constitutional provision by its ratifiers. [Citation omitted.]" *People v. Nutt*, 469 Mich. 565, 573, 677 N.W.2d 1 (2004). To do this, Michigan courts "apply the rule of 'common understanding[,]'" which means that "people are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding." 469 Mich. at 573; see *People v. Tanner*, 496 Mich. 199, 223, 853 N.W.2d 653 (2014) ("The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.").

Even with these principles of constitutional interpretation firmly in hand, the conscientious judge will understand that all texts, even those "penned with the greatest technical skill" are "more or less obscure . . . until their meaning be liquidated and

18

ascertained by a series of particular discussions and adjudications." James Madison, The Federalist No. 37, p. 229 (Modern Library ed. 1969). Madison went on to articulate what every judge involved in constitutional interpretation learns from experience—that the "complexity of objects" served by the constitutional text and the "imperfection of the human faculties" leads often to "fresh embarrassment[s]" in any interpretive endeavor. The Federalist No. 37, p. 229. Even the commands of the "Almighty himself," Madison wryly notes, are "rendered dim and doubtful by the cloudy medium through which [they are] communicated." The Federalist No. 37, p. 230.

This Madisonian humility—attendant as it is to the indeterminacy of language and the difficulties of the interpretive process—must be considered a third, equally important leg of the originalist stool. As Justice Felix Frankfurter put it, because the judicial power is the "power of negation" rather than the "power to shape measures for dealing with the problems of society . . . the indispensable judicial requisite is intellectual humility." *A. F. of L. v. American Sash Co.*, 335 U.S. 538, 557, 69 S. Ct. 260, 93 L. Ed. 222 (1949) (Frankfurter, J., concurring). In this, he echoed Justice David Brewer's comment that "[the courts] make no laws, they establish no policy, they never enter into the domain of popular action. . . . Their functions in relation to the State are limited to seeing that popular action does not trespass upon . . . [the] written constitutions." The Nation's Safeguard, Address Before the Sixteenth Annual Meeting of the New York State Bar Association 46 (January 1893). And years later, writing for the Court, Chief Justice Roberts would quote Justice Frankfurter to the same effect: "'Whatever temptations the statesmanship of policy-making might wisely suggest,' the . . . . judge 'must not read in by way of creation,' but instead abide by the 'duty of restraint, th[e] humility of function as merely the translator of another's command.'" *Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

19

There is, however, another interpretive model lurking in our caselaw. Instead of law as an ever-fixed mark, this theory posits the Constitution as a servant of time. As times change, the thinking goes, so too must our interpretation of the law. Thus, as its meaning shifts to reflect vacillating social sensibilities, the Constitution becomes a kind of mood ring for the zeitgeist of the age. Moreover, this framework gives judges the power to announce the new colors of the constitutional text whenever the kaleidoscope of history turns.

Following this theory, we have declared that "the constitution must be given flexibility so that it may vibrate in tune with the vicissitudes of time. . . . [But] the flexibility theory of constitutional construction should not be followed to the point of regarding the dominant document as being merely worthy of mention." *State, ex rel., v. Hines*, 163 Kan. 300, 301, 182 P.2d 865 (1947). We have said explicitly that constitutions "should march abreast of the times" and the constitutional text "must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress." *Markham v. Cornell*, 136 Kan. 884, 891, 18 P.2d 158 (1933); see also *Postlethwaite v. Edson*, 102 Kan. 619, 643, 171 P. 769 (1918) ("constitutions march, aided by judicial interpretation"). This vibrating, flexing, and marching constitution is more often simply referred to as a "living" constitution. *Rummel v. Estelle*, 445 U.S. 263, 307, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (Powell, J., dissenting) ("We are construing a living Constitution.").

Is the meaning of our Constitution fixed or flexible? A great deal turns on how judges answer this question, and each answer finds at least some support in our prior decisions. In light of this mixed pedigree, it would behoove us to consider the question anew. The brief of reason, liberty, and experience argues forcefully in favor of a fixed meaning. The opposing brief of hubris, progress, and good intentions holds forth the enticing fruit of "flexibility." But we should resist the temptation. The problem with

judges striving to pick up on vibrations emanating from a constitutional text as it yields to the march of progress is that the process tends to produce results we "just can't explain." Brian Wilson, *Good Vibrations*, *on* SMiLE (Nonesuch Records 2004).

Nowhere, perhaps, is this more powerfully illustrated than in the history of this court's interpretation of section 9 of the Kansas Constitution Bill of Rights. Adopted in 1859, section 9 states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." For years, this court interpreted section 9 to apply only to the type of punishment imposed, not whether the punishment was proportional to the crime of conviction:

> "Imprisonment in the penitentiary at hard labor is not of itself a cruel or unusual punishment within the meaning of § 9 of the bill of rights of the constitution, for it is a kind of punishment which has been resorted to ever since Kansas has had any existence, and is a kind of punishment common in all civilized countries. *That section of the constitution probably, however, relates to the kind of punishment to be inflicted, and not to its duration.* Although the punishment in this case may be considered severe, and much severer indeed than the punishment for offenses of much greater magnitude, as adultery, or sexual intercourse coupled with seduction, yet we cannot say that the act providing for it is unconstitutional or void." (Emphasis added.) *The State v. White*, 44 Kan. 514, 520- 21, 25 P. 33 (1890).

See also *The State v. Gillmore*, 88 Kan. 835, 845, 129 P. 1123 (1913) (hard labor for nonsupport by husband was not cruel or unusual punishment); *In re Ellis*, 76 Kan. 368, 375, 91 P. 81 (1907) (imprisonment for failure to pay costs taxed against a defendant is not cruel or unusual punishment).

But in 1910, the United States Supreme Court suggested the Eighth Amendment's prohibition on "cruel and unusual punishment" may contain a proportionality requirement. *Weems v. United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910).

21

Prior to *Weems*, the Supreme Court interpreted "cruel and unusual punishment" to prohibit only certain types of punishment, not punishments that may be disproportionate to the actual crime committed. See *In re Kemmler*, 136 U.S. 436, 447, 10 S. Ct. 930, 34 L. Ed. 519 (1890) ("Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."); *Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L. Ed. 345 (1878) ("[I]t is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden."); see also Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Cal. L. Rev. 839, 842 (1969) ("Attempts to extend the meaning of the clause to cover any punishment disproportionate to the crime were rebuffed throughout the nineteenth century.").

In *Weems*, the Supreme Court held a 15-year sentence of hard labor while chained at the feet and hands was cruel and unusual punishment when imposed on a government official convicted of falsifying records. 217 U.S. at 381. Discussing the "precept of justice that punishment for crime should be graduated and proportioned to offense," the Court noted commentators at the time argued the Eighth Amendment "may acquire meaning as public opinion becomes enlightened by a humane justice. [Citations omitted]." 217 U.S. at 367, 378. While scrutinizing the facts of the case, the Court considered how similar crimes were punished in other areas of the United States and held the sentence "exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice." 217 U.S. at 381.

Then, in *Trop v. Dulles*, 356 U.S. 86, 103, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958), the Supreme Court held that the denationalization of a U.S. citizen for wartime desertion

violated the Eighth Amendment. Although the Supreme Court did not directly address the question of proportionality, Chief Justice Warren famously stated, "The Court recognized in [*Weems*] that the words of the Amendment are not precise, and that their scope is not static. The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 100-01.

These evolutions in the Supreme Court's Eighth Amendment jurisprudence apparently induced sympathetic vibrations in section 9. Beginning with *State v. Coutcher*, 198 Kan. 282, 424 P.2d 865 (1967), the Kansas Supreme Court signaled a change in how it would interpret section 9. Although we held 18-years' hard labor resulting from the operation of a recidivist statute was not cruel and unusual punishment, our predecessors observed:

> "While the prohibition of the Eighth Amendment to the United States Constitution has generally been considered to be directed against physical cruelty and torture, there is authority to the effect that it also may be invoked against excessively and disproportionately long prison sentences." 198 Kan. at 287.

For support, the *Coutcher* court quoted a small portion of *Weems* in which the Supreme Court cited a Massachusetts Supreme Court case conceding the possibility that a long prison term "'"might be so disproportionate to the offense as to constitute a cruel and unusual punishment."'" *Coutcher*, 198 Kan. at 287-88 (quoting *Weems*, 217 U.S. at 368 [quoting *McDonald v. Commonwealth*, 173 Mass. 322, 328, 53 N.E. 874 (1899)]). Notably, *Coutcher* offered no discussion of the textual or historical differences between section 9 and the Eighth Amendment, evidently lumping the two together.

A decade later, we officially recognized a proportionality component of section 9 in *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978). After briefly citing *Weems* and *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), a death

penalty case, the *Freeman* court announced three factors for courts to consider when deciding whether the length of a sentence constitutes a cruel punishment:

> "(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

> "(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

> "(3) A comparison of the penalty with punishments in other jurisdictions for the same offense." 223 Kan. at 367.

In *Rummel*, a sharply divided Supreme Court purported to limit the Eighth Amendment's proportionality principle. *Rummel v. Estelle*, 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980). Faced with the implications of *Rummel* and our recently articulated *Freeman* factors, we again revisited the proportionality principle in *State v. McDaniel & Owens*, 228 Kan. 172, 184, 612 P.2d 1231 (1980). Initially, the *McDaniel* court recognized:

> "*Rummel* is a retreat from the philosophy which spawned the three techniques recited in *Freeman*. The court in *Rummel* essentially rejects the proposition that disproportionality analysis is required by the 8th Amendment. The length of sentences imposed on felons is solely a legislative decision. As the *Rummel* dissent reflects, the factors enunciated in the three techniques of *Freeman* were derived from [*Weems*] and the United States Supreme Court's death penalty cases. [Citations omitted.]" 228 Kan. at 184.

And while the *McDaniel* court stated *Rummel* "forces this court to reconsider its reliance on the 8th Amendment prohibition against cruel or unusual punishment," it proclaimed without any independent analysis of section 9: "We now hold section 9 of the Kansas Bill of Rights may be invoked against an excessive or disproportionate sentence. The nature of a sentence as cruel or unusual encompasses duration. The techniques applied in *Freeman* will continue to guide our constitutional inquiry." 228 Kan. at 184-85. As such, *McDaniel* "found that a disproportionately long prison term could violate the Kansas Constitution, even though it would not violate the federal constitution at that particular time." *State v. Lawson*, 296 Kan. 1084, 1092, 297 P.3d 1164 (2013) (summarizing *McDaniel*'s response to *Rummel*). The *McDaniel* court purported to interpret section 9 without once even considering the actual meaning or history of the text of our Constitution.

Three years later, Eighth Amendment jurisprudence flipped again as the minority in *Rummel* became the majority of the Court when Justice Blackmun changed his vote in *Solem v. Helm*, 463 U.S. 277, 292, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). Like Rummel, Solem was convicted of a relatively minor felony relating to fraud and was sentenced under a recidivist statute. But unlike Rummel, Solem's life sentence lacked the possibility of parole. Contending this distinction was dispositive, the Supreme Court seized the opportunity to reinstate its proportionality principle. See 463 U.S. at 290-92, 297.

The modern-day debate over proportionality stems from the Supreme Court's subsequent tack in *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991). The only majority reached by the justices in *Harmelin* was for the outcome— the Michigan law in question imposing a mandatory life sentence without parole for possession of at least 650 grams of cocaine did not violate the Eighth Amendment.

501 U.S. at 994-96. The justices divided, however, on what role, if any, proportionality should play in the analysis.

Justice Scalia and Chief Justice Rehnquist concluded that the original meaning of the Eighth Amendment did not include a proportionality principle. 501 U.S. at 985; see also *Ewing v. California*, 538 U.S. 11, 31, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (Scalia, J., concurring in the judgment) ("In my opinion in [*Harmelin*], I concluded that the Eighth Amendment's prohibition of 'cruel and unusual punishments' was aimed at excluding only certain *modes* of punishment, and was not a 'guarantee against disproportionate sentences.' Out of respect for the principle of *stare decisis*, I might nonetheless accept the contrary holding of [*Solem*]—that the Eighth Amendment contains a narrow proportionality principle—if I felt I could intelligently apply it.").

Justice Kennedy, joined by Justices O'Connor and Souter, argued for a "narrow proportionality principle" in "noncapital sentences." *Harmelin*, 501 U.S. at 997-1001 (Kennedy, J., concurring). And the Kennedy approach has subsequently held sway. See *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) (stating that "'[t]he concept of proportionality'" is viewed "less through a historical prism than according to '"the evolving standards of decency that mark the progress of a maturing society"'"); *Graham v. Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) ("For the most part . . . the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime."); *Ewing*, 538 U.S. at 23-24 (plurality opinion) ("The proportionality principles in our cases distilled in Justice Kennedy's concurrence guide our application of the Eighth Amendment in the new context that we are called upon to consider.").

Back in Kansas, in *Harmelin*'s wake, we modified our "cruel or unusual" jurisprudence again, announcing that we would no longer use the *Freeman* factors to

26

analyze challenges to the *method of punishment* rather than the length of a sentence. See *State v. Scott*, 265 Kan. 1, 9, 961 P.2d 667 (1998) ("While there may still be instances where the *Freeman* test should be applied, we will not apply it precisely here where the method of punishment, rather than the length of a sentence, is challenged as cruel or unusual. Neither this court nor the Supreme Court has applied such test outside of the length of sentence context."), *abrogated on other grounds by Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003); see also *State v. Kleypas*, 272 Kan. 894, 1032- 33, 40 P.3d 139 (2001) (stating *Scott* "severely limited the application of the *Freeman* factors" and the test only applies where the length of a sentence is challenged) *overruled in part on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

Currently, we formulate our judicially created proportionality principle as follows: "'Under § 9 of the Kansas Constitution Bill of Rights, a punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" *State v. Spear*, 297 Kan. 780, 799, 304 P.3d 1246 (2013); see also *State v. Funk*, 301 Kan. 925, 943, 349 P.3d 1230 (2015) ("[L]ifetime postrelease supervision is not so disproportionate a punishment to an 18- or 19-year-old man's participation in a sex act with a 14-year-old girl that the punishment is shocking to the conscience or offensive to fundamental notions of human dignity."); *State v. Toahty-Harvey*, 297 Kan. 101, 106, 298 P.3d 338 (2013) ("Toahty-Harvey challenges the length of time he was ordered to be on postrelease supervision, rather than complaining that postrelease supervision is a cruel or unusual method of punishment.").

Notably, none of this caselaw makes any effort to analyze the text of section 9, the history or context of its drafting and ratification, or the common and ordinary understanding of the words used at the time of ratification. The *Freeman* factors are little

27

more than free-floating codicils to the Constitution, adopted and frequently revised over the past forty years by this court. The "flexibility theory of constitutional construction" has been followed to the point of "regarding the dominant document" as being *not even* "worthy of mention." *Hines*, 163 Kan. at 301.

Recently, however, we did return in a different context to the text and history of section 9. In *State v. Petersen-Beard*, 304 Kan. 192, 209-10, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016), we interpreted the word "punishment" in section 9 and at least considered whether there existed any "textual or historical evidence that the drafters of § 9 intended the meaning of 'punishment' to differ from the same word's meaning as used in the Eighth Amendment."

Nonetheless, for now the *Freeman* factors are the law of Kansas in cases such as the one now before us. I do not fault today's majority for deciding the case on these grounds, and I join that decision. It would be imprudent, in my view, to consider a wholesale revision of our section 9 jurisprudence without first hearing well developed and briefed arguments from the parties and any interested amici.

Kansas Supreme Court Justice Harold Fatzer once warned that no matter how we

> "'interpret the provisions of the Constitution, it is still the Constitution which is the law and not the decision of the Court. . . .
>
> . . . .
>
> "'[T]he Judiciary should always be pervious to demonstration of judicial error as to the original meaning of the Constitution, and be prepared to correct its own mistakes.'" *Harris v. Anderson*, 194 Kan. 302, 314-15, 400 P.2d 25 (1965) (Fatzer, J., dissenting) (quoting 3 Warren, The Supreme Court in United States History 470-71 [1922]).

28

While there is much to be said for this view, there are countervailing principles of stare decisis that must be considered. And while I think that, as one judge put it recently, the original meaning of the Constitution should "prevail over slavish devotion to judge-made, form-over-substance, multi-factor tests" such as we have in *Freeman*, I am not willing to prematurely declare that in this area of our constitutional jurisprudence we have "miss[ed] the constitutional forest for the judge-planted trees." *ETC Marketing v. Harris County*, 528 S.W.3d 70, 90 (Tex. 2017) (Brown, J., concurring).

That said, the argument that the original meaning of the text of section 9 does not include a proportionality principle appears strong. A cursory review of the circumstances surrounding its adoption suggests the framers and ratifiers of our Constitution never thought they were including a proportionality principle. As we have often recognized, the Kansas Constitution was modeled after the 1851 Ohio Constitution. See, e.g., *Petersen-Beard*, 304 Kan. at 210. The 1851 Ohio Constitution did not contain a proportionality clause. See Ohio Const. art. I, § 9 (1851). This is significant for two reasons. First, several other state constitutions from that era contained proportionality clauses. See W. Va. Const. art. III, § 5 (1872) ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Penalties shall be proportioned to the character and degree of the offence."); Ga. Const. art. I, § 21 (1868) ("All penalties shall be proportioned to the nature of the offence."); Ind. Const. art. I, § 16 (1851) ("Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offence."); R.I. Const. art. I, § 8 (1842) ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and all punishments ought to be proportioned to the offence."); Me. Const. art. I, § 9 (1820) ("Sanguinary laws shall not be passed:  all penalties and punishments shall be proportioned to the offence:  excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted.").

Second—and closer to the mark—prior to the 1851 revisions to the Ohio Constitution, that state's constitution also explicitly set forth a proportionality requirement:

> "All penalties shall be proportioned to the nature of the offence. No wise legislature will affix the same punishment to the crimes of theft, forgery, and the like, which they do to those of murder and treason. When the same undistinguished severity is exerted against all offences, the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do the lightest offences. For the same reasons, a multitude of sanguinary laws are both impolitic and unjust; the true design of all punishments being to reform, not to exterminate, mankind." Ohio Const. art. VIII, § 14 (1802).

What we can surmise from this historical record—and from the fact that our Constitution followed the Ohio impulse of 1851 by excluding a proportionality clause—is a question for another day. The parties have not briefed this issue, so it is not properly before us. See *State v. Meredith*, 306 Kan. 906, 909, 399 P.3d 859 (2017) (an issue not briefed is waived or abandoned). It is sufficient at this point to observe that it is possible our *Freeman* based proportionality jurisprudence has no footing in the actual text and history of section 9 of the Kansas Constitution Bill of Rights. Thus, while I concur with and join today's decision, I write here in the hopes of recovering "the dominant document" as something quite a bit more than a dust covered anachronism, forgotten by the march of progress, meriting only a "mere[] . . . mention." *Hines*, 163 Kan. at 301.

30